IN THE UNITED STATE DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| TEMPLE EMANUEL | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.: 7:14-cv-513 |
| | § | Jury Demanded |
| CHURCH MUTUAL INSURANCE | § | |
| COMPANY | § | |
|     Defendant. | § | |

### DEFENDANT CHURCH MUTUAL INSURANCE COMPANY'S
### MOTION TO EXCLUDE EXPERT OPINIONS ON CAUSATION

COMES NOW, Defendant Church Mutual Insurance Company ("Defendant" or "Church Mutual"), and files this Motion to Exclude Expert Opinions on Causation and in support thereof shows as follows:

**PROCEDURAL BACKGROUND**

On March 28, 2014, Plaintiff Temple Emanuel ("Plaintiff") filed Plaintiff's Original Petition in Cause No. C-2797-14-A; *Temple Emanuel v. Church Mutual Insurance Company*; In the 92nd District Court of Hidalgo County, Texas ("State Court Suit").

On June 5, 2014, Church Mutual filed its Original Answer in the State Court Suit asserting a general denial as permitted by the Texas Rules of Civil Procedure.

On June 20, 2014, Church Mutual filed its Notice of Removal removing this matter from the 92nd District Court of Hidalgo County, Texas to the United States District Court for the Southern District of Texas, McAllen Division.

On October 31, 2014, Plaintiff filed its Expert Disclosures and Designation of Expert Witnesses listing Guadalupe Garza as an expert witness who will testify as to whether Plaintiff's

1

roof sustained damage from a hail and windstorm in March 2012 and the cost of repairs to such damage.

On January 29, 2014, Plaintiff produced a report and an estimate by Mr. Garza. On May 19, 2015, Mr. Garza was deposed.

### ARGUMENT AND AUTHORITIES

> Federal Rule of Evidence 702 states that an expert witness 'who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if':
> (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based upon sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the witness has applied the principles and methods reliably to the facts of the case.

*Macy v. Whirlpool Corp.*, No. 4:10-CV-1861, 2015 U.S. App. LEXIS 9338, at *5 (June 4, 2015) (citing FED. R. EVID. 702); *see also Kozak v. Medtronic, Inc.*, 512 F. Supp. 2d 913, 917 (S.D. Tex. 2007).

"Rule 702 embodies the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, which emphasizes the trial courts' role as 'gatekeepers' to ensure that proffered expert testimony is 'not only relevant, but reliable.'" *Macy*, 2015 U.S. App. LEXIS 9338, at *5 (citing *Brown v. Illinois Cent. R.R. Co.*, 705 F.3d 531, 535 (5th Cir. 2013); *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993)). "'The reliability prong mandates that expert opinion 'be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief.'" *Macy*, 2015 U.S. App. LEXIS 9338, at *5 (citing *Johnson v. Arkema*, 685 F.3d 452, 459 (5th Cir. 2012).

> When assessing reliability, courts consider the following non-exclusive list of factors: (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of

2

> error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community.

*Macy*, 2015 U.S. App. LEXIS 9338, at *5 n. 10 (citing *Johnson*, 685 F.3d at 459). "[A]n expert's testimony must be reliable at every step, including the methodology employed, the facts underlying the expert's opinion, and the link between the facts and the conclusion." *Macy*, 2015 U.S. App. LEXIS 9338, at *10-11 (citing *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 354-55 (5th Cir. 2007). "'The relevance prong requires that the proponent demonstrate that the expert's 'reasoning or methodology can be properly applied to the facts in issue.'" *Macy*, 2015 U.S. App. LEXIS 9338, at *5 n. 10 (citing *Johnson*, 685 F.3d at 459).

In its gate-keeping role, the

> court must determine whether an expert is qualified and whether his testimony is reliable and relevant. The purpose is 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'

*Kozak*, 512 F. Supp. 2d at 917 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 1176 (1999)).

In a well-known article written in 1999, Judge Harvey Brown identified eight particular gates of admissibility for expert testimony under Texas law and federal law.[1] *See* Harvey Brown, *Eight Gates for Expert Witnesses*, 36 HOUS. L. REV. 743 (1999); *see also* Harvey Brown, *Expert Witness 2012 Update*, 11 STATE BAR OF TEXAS 28TH ANNUAL ADVANCED PERSONAL INJURY COURSE 2012 1 – 76 (2012). Judge Brown discussed the eight gates at length in an update published in 2014. Harvey Brown et al., *Eight Gates for Expert Witnesses: Fifteen Years*

---

[1] Although Judge Brown's article involves both Texas law and federal law and this matter is governed by the Federal Rules of Evidence (and not the Texas Rules of Evidence), there are substantial parallels between the Federal Rules of Evidence and the Texas Rules of Evidence and the admissibility of expert testimony.

3

*Later*; 52 HOUS. L. REV. 1 (2014).  In the 2014 article, Judge Brown explains "Rules 703 and 705 were discussed as the seventh gate for expert testimony in the 1999 Eight Gates article. … It is more accurate to describe the inquiries under this gate as part of the predicative reliability gate. Thus, we have concluded that there are seven, not eight, gates."  *Eight Gates for Expert Witnesses:  Fifteen Years Later*; 52 HOUS. L. REV. 1, 176 n. 1011 (2014).

The seven gates include the following:

- helpfulness to the fact finder;
- the expert's qualifications;
- relevance of the testimony;
- predicative reliability;
- methodological reliability;
- connective reliability; and
- unfair prejudice (Federal Rule of Evidence 403).

*Eight Gates for Expert Witnesses:  Fifteen Years Later*; 52 HOUS. L. REV. 1, 5, 176 n. 1011 (2014); *Expert Witness 2012 Update*, 11 STATE BAR OF TEXAS 28TH ANNUAL ADVANCED PERSONAL INJURY COURSE 2012 at 1 – 3 (2012).

Predicative reliability, which was formerly called foundational reliability, relates to the underlying inadmissible evidence on which an expert may rely under Federal Rule of Evidence 703.  *See Eight Gates for Expert Witnesses:  Fifteen Years Later*; 52 HOUS. L. REV. 1, 5 n. 15, 176 n. 1011 (2014); *Expert Witness 2012 Update*, 11 STATE BAR OF TEXAS 28TH ANNUAL ADVANCED PERSONAL INJURY COURSE 2012 at 2 (2012).  Methodological reliability involves an examination of "the methodology, accuracy, and reasoning of a testifying expert's own analysis and opinions."  *See Eight Gates for Expert Witnesses:  Fifteen Years Later*; 52 HOUS. L. REV. 1, 101 (2014) (citation omitted).  Connective reliability involves an examination of "the methodology, accuracy, and reasoning employed by the experts on whose studies, articles, data collections, or conclusions the testifying expert relies."  *Id.* (citation omitted).  These three

4

reliability gates "are inextricably intertwined, overlapping, and synergetic, but they are nevertheless distinct requirements that expert evidence must independently satisfy to meet the standards for admissible and competent evidence. Each gate is necessary, and no two gates are, alone, sufficient." *Id.* at 290.

As an individual whose day to day job is roof installations and whose primary "expert" qualification is training from roofing manufacturers, there is simply no doubt that Mr. Garza's testimony on the causation of the roof damage does not pass all seven gates.

**A. Mr. Garza is not qualified to testify on causation of roof damage as he is only a contractor with training from roofing manufacturers and not an engineer.**

During his deposition, Mr. Garza initially described his "qualifications," and specifically his training related to roofing. Mr. Garza testified as follows:

```
Q.   Tell me what training you've had in roofing
     and waterproofing.

A.   I am a certified installer for MBCI NCI for
     installing their various types of metal
     roofing.  I have also from -- Berridge
     Manufacturing is another metal -- metal
     supplier.  I'm also a certified installer
     for Fabral.  I'm also a certified installer
     for GAF, Johns Manville, Siplast, Soprema,
     Garland.    Just   about   every   major
     manufacturer in the built-up and modified
     roofing industry.  I'm also certified by
     Carlisle.  Here again, GAF for the various
     manufacturers in TPO roofing and PVC
     roofing.

Q.   Okay.

A.   And -- well, basically, all my training has
     been  through  hands-on  experience  and
     technical -- my -- the -- the training
     classes they provided through the roofing
     manufacturers.
```

*See* Deposition of Lupe Garza ("Garza Deposition"), pg. 7, line 13 to pg. 8, line 5, attached and

5

incorporated herein as Exhibit A.[2]

While Mr. Garza has knowledge of the installation of certain types of roofing systems, he has no specified knowledge that qualifies him to testify on causation of specific property damage. Similarly, Mr. Garza may have some skills that qualify him as an expert on installation of roofing systems but he does not have any specialized skills that qualify him as an expert on causation of specific property damage. *See Macy*, 2015 U.S. App. LEXIS 9338, at *5; FED. R. EVID.702.

Mr. Garza also has very limited experience in determining causation of specific property damage. Mr. Garza testified that he sometimes works with engineers and prepares only an estimate based on the engineer's report and at other times he prepares both a report and an estimate. *See* Garza Deposition, Exhibit A, pg. 15, line 18 to pg. 16, line 22. Mr. Garza also testified that he works for sixteen different law firms. *See id.* at pg. 10, line 3. Mr. Garza had over fifty active cases at the time of his deposition and had written a report for eight to ten of the fifty cases. *See id.* at pg. 12, lines 14 – 17; pg. 15, lines 3 – 6. Notably, Mr. Garza admitted that, out of the sixteen different law firms for whom he works, he only prepares a report on causation for one law firm/attorney, i.e. counsel for Plaintiff, and it accounts for "probably about 10 … or so" of his fifty cases. *See* Garza Deposition, Exhibit A, pg. 46, lines 10 to 21.

The foregoing facts show the lack of reliability of Mr. Garza's testimony on causation.[3] *See Simpson v. Quarterman*, 593 F.Supp.2d 922, 937 (E.D. Tex. 2009) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir.1995), *cert. denied*, 516 U.S. 869 (1995)) (stating "one, but not the only, factor to consider in determining reliability of expert

---

[2] Mr. Garza testified that he attended Del Mar College and studied project management but did not finish and only attended for a year and a half. *See* Garza Deposition, Exhibit A, pg. 6, line 13 to pg. 7, line 6.
[3] This fact in and of itself also suggests Mr. Garza is not qualified to testify on causation of property damage, i.e. if Mr. Garza were qualified to give such testimony, he would in all likelihood be asked to give such testimony by additional attorneys and not only counsel for Plaintiff in this case).

testimony is whether it is based on research conducted independently of the litigation"); *see also American Honda Motor Co. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010) (citing FED. R. EVID. 702 Advisory Committee's Notes (2000 Amends.); *Fuesting v. Zimmer*, Inc., 421 F.3d 528, 534-35 (7th Cir. 2005), *vacated in part on other grounds*, 448 F.3d 936 (7th Cir. 2006)) (stating "the Advisory Committee's Notes to Rule 702 suggest other benchmarks for gauging expert reliability, including whether the testimony relates to 'matters growing naturally and directly out of research they have conducted independent of the litigation, or <u>whether they have developed their opinions expressly for purposes of testifying</u>'; ….."'); *United States v. Frazier*, 387 F.3d 1244, 1297 (11th Cir. 2004)) (emphasis added) (citing FED R. EVID. 702 advisory committee's notes, 2000 amend.) (stating "Advisory Committee Notes to Rule 702 delineate five additional factors in determining reliability: (1) Whether the testimony 'grow[s] naturally and directly out of research [experts] have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying'…"); *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir. 2003) (citing *Daubert*, 43 F.3d at 1317) (referring to independent research factor as "one very significant fact to be considered" in determining reliability).  These facts also show Mr. Garza's rather minimal experience in determining causation of specific property damage.  Furthermore, Mr. Garza has not done any independent research to learn about the various causes of roof damage.  *See* Garza Deposition, Exhibit A, pg. 7, line 13 to pg. 8, line 5; pg. 15, line 18 to pg. 16, line 22; pg. 46, lines 10 to 21.  Instead, he has ventured into this extraneous "area of expertise" at the sole behest of Plaintiff's counsel.

     Mr. Garza also has no education that qualifies him to testify on causation of specific property damage.  Mr. Garza has some knowledge, skill, experience and training in installation of roofing systems by various manufacturers.  *See id.* at pg. 7, line 13 to pg. 8, line 5.  At best,

7

Mr. Garza has seen various examples of roof damage but he does not have the requisite knowledge, skill, experience, training and/or education for determining the actual <u>cause</u> of such damage.

Mr. Garza does not have the knowledge, skill, experience, training or education necessary to qualify him to testify on causation of the damage to Plaintiff's roof.  Since Mr. Garza is not qualified to give such testimony, Church Mutual's Motion to Exclude Expert Opinions on Causation should be granted.

> **B.    Mr. Garza's methodology is not reliable and it does not pass the methodological reliability gate.**

In his deposition, Mr. Garza testified about the methodology he uses to determine the cause of roof damage.

```
Q.   Tell me your definition of physical damage
     due to a hailstorm.

A.   Basically go up there to do a -- a visual
     inspection of the -- of the property.  We
     go up there, depending on the composition
     of the roof, whether it's an asphalt
     shingle, metal -- metal roofing, built-up
     roofing, concrete -- clay tile, concrete
     tile.   It's just various aspects of
     roofing.  And then we go look for signs of
     physical damage where impacts or strikes
     had hit the -- the -- the roof.

Q.   Okay.  So if I have a building, a house, or
     a commercial building, and a hailstorm
     comes through McAllen in the area of the
     building, be it residential or commercial,
     have you ever gone out there and seen,
     although it was right in the path, there
     was no hail damage?

A.   Yes, sir.

Q.   How can that occur?

A.   You have to talk to the big man upstairs.
```

> Q. Well, does it mean in your opinion that no hail, no matter what size, struck that building, the roof of the building?  Or does it mean it was struck, but the hail wasn't a sufficient size and strength to cause an impact?
>
> A. Here again, I'm not a meteorologist. You're asking me to testify on something I don't –

*See* Garza Deposition, Exhibit A, pg. 17, line 7 to pg. 18, line 7.  As can be seen from the foregoing testimony, Mr. Garza does not know how a property could have no hail damage when it was in a hailstorm's path or what it means when a property has no hail damage despite being in a hailstorm's path.  *See id.*

> Q. All right.  If there -- hail falls on that parking lot, in my hypothet, you're going to have physical damage, are you not?
>
> A. If it hits -- if you've got a hailstorm that hits and -- hits something, yes, you're going to have damage.
>
> Q. Okay.  Does it depend on the size of the hail?
>
> A. A lot of times, yes, sir.
>
> Q. Okay.  Can you have a hailstorm right over a building and you go up the next day and it is pristine?
>
> A. Yes, sir.
>
> Q. How can that happen?
>
> A. It's small pea-size hail.
>
> Q. Okay.  So it makes a difference, based upon your experience, on the size of the hail?
>
> A. Yes, sir.
>
> Q. Okay.  Have you read or done any study on any articles or do you have any articles on studies done that show a relationship between the size of the hail and the

9

```
                    damage?

         A.   No, sir.

         Q.   Have you seen or read any articles that
              talk about how hail is measured or
              determined by the weather department?

         A.   No, sir.
```

*See id.* at pg. 19, lines 1 to 25.

Mr. Garza admitted that, in arriving at his conclusions, he did not consider whether any property damage occurred during installation of the roof:

```
         Q.   Was the -- anybody -- member of the
              congregation ever out there to show you
              what you were looking at or what you were
              supposed to do?

         A.   No, sir.  We just went inside. There was --
              the first time we went in there, we -- we
              notified the lady that was going inside the
              office, just to let her know -- we
              identified ourselves and who we were with
              and take a look and inspect the building.
              They said, "Just go ahead.  Be careful."

         Q.   Okay. Now, in your -- could some of the
              damage you saw to the metal panels have
              been done during installation?

         A.   I didn't pay much attention to that, since
              it's not what I was looking for.
```

*See id.* at pg. 63, line 15 to pg. 64, line 3. This factor shows Mr. Garza's testimony is not reliable. *See Allen*, 600 F.3d at 817 (stating "… Advisory Committee's Notes to Rule 702 suggest other benchmarks for gauging expert reliability, including … '[w]hether the expert has adequately accounted for obvious alternative explanations …..'") (citations omitted).

Mr. Garza also testified he was merely looking for displaced parts of the roof in distinguishing installation damage from hail damage:

```
         Q.    Okay.  So you were looking for -- what were
```

> you looking for in -- describe what you were looking for to distinguish between installation damage versus hail damage.
>
> A. Well, I'm there -- there to see if there's any damage done to the physical panel, if there's any dents, dings to the panels, any deficiencies caused – any damage caused by the wind or the hail. If there was areas where there was uplift on the panels or where there was -- for instance, right there where the metal facia was ripped off, you have -- you know the wind ripped that section and piece off -- ripped the section of panel off, metal facia off. And so we were looking there to see if there was any more -- anything -- anything else was loose on the -- on that facia side of the -- the facia on that side of the building.
>
> Q. You found damage on every side of the building to the panels, straight and curved –
>
> A. Yes, sir.

*See* Garza Deposition, Exhibit A, pg. 64, lines 6 to 25. Mr. Garza did not identify why or how only hail can cause parts of the roof to be displaced. *See id.*

Mr. Garza also testified about the granules on the roof:

> Q. How do you tell the difference -- do you tell the difference, Mr. Garza -- between granules that have been moved by wind, movement, by somebody walking on it, by a tree branch landing on it versus hail?
>
> A. One of the things that we look for is how much granule loss, the accumulation of granules that have accumulated on the roof. One of the things that we look for to see the -- the -- the strikes, to see if there are any hits, any physical damage where you can see impact hits in the granules where you can see the hail hit it. Then the granules, of course, they're going to polish off because they're no longer impregnated in the membrane. Next thing you go up there is you have the hail, the wind, and the rain. And you notice towards

11

```
             the outlets or towards the drains you see a
             tremendous amount of granule accumulation
             around these areas.  And, you know, that's
             because a lot of that stuff -- a lot of the
             granules were polished off the membrane
             during that event.  On a normal rainfall,
             you're not going to have all the granule
             loss.

       Q.    And what size hail do you have to have,
             have you seen studies done, in order to
             cause this procedure, this process that you
             just described?

       A.    It's just in my past -- in my working
             experience, sir.

       Q.    Well, is that all hailstorms or only of a
             certain size hailstorms?

       A.    I've seen from baseball-size hail.  I've
             seen to pea-size hail.  I've seen some
             where there's pea-size hail didn't do any
             damage to the roof.
```

*See id.* at pg. 71, line 19 to pg.72, line 25. As shown by the foregoing testimony, Mr. Garza relies only on his own "working experience" and no studies or other expert information in determining the granule accumulation was caused by hail. *See Macy*, 2015 U.S. App. LEXIS 9338, at *5 n. 10 (stating that in determining reliability, courts consider whether the theory has been tested, whether the theory has been subjected to peer review and publication, the known or potential rate of error of the method used, the existence and maintenance of standards controlling the technique's operation, and whether the theory has been generally accepted by the scientific community). Mr. Garza's testimony shows his theory regarding granule accumulation has not been tested or subjected to peer review or publication. Mr. Garza's testimony also shows his theory is not one that is known in the community, no less has it been generally accepted in the community.

Notably, Mr. Garza also admitted that he did not determine whether any prior storms

could have caused the granule accumulation:

> Q. Okay. Was this temple roof struck by hail in April of 2012?
>
> A. I did not check the -- the -- the weather channel. I did not check on radar or anything like that, no, sir, I did not.
>
> Q. Did you determine whether or not there were any other storms in the area of this temple from March of 2012 until December of 2014 such that those granulars could have been moved, displaced by such a storm?
>
> A. No, sir. My -- like I said, my -- my task when -- I was asked -- called out there to go out there and determine to see if there was any type of hail or wind damage to the building. I did not inquire with the -- the local satellite or the weather service to determine the direct path, the date, the time, no, sir, I did not do that.
>
> Q. In your report, though, you trace all the damage back to one time, one event, do you not?
>
> A. Back to the hailstorm, yes.
>
> Q. The hailstorm of March 2012.
>
> A. Yes, sir.
>
> Q. And you did that because that's what you were hired to do, true?
>
> A. True.

*See* Garza Deposition, Exhibit A, pg. 89, line 15 to pg. 90, line 13.

The fact that Mr. Garza did not consider or determine whether other storms could have caused the granule accumulation shows his testimony is not reliable. *See Allen*, 600 F.3d at 817 (stating "… Advisory Committee's Notes to Rule 702 suggest other benchmarks for gauging expert reliability, including … '[w]hether the expert has adequately accounted for obvious alternative explanations …..'") (citations omitted).

An examination of the methodology, accuracy and reasoning of Mr. Garza's own analysis and opinions shows it is not methodologically reliable. *See Eight Gates for Expert Witnesses: Fifteen Years Later*; 52 HOUS. L. REV. 1, 101 (2014) (citation omitted). Mr. Garza admitted he does not know the reason hail may not damage a structure, he is not familiar with how hail is measured, he did not consider whether any purported roof damage occurred at installation, he does not know whether prior storms caused the granule accumulation and he traced all the damage back to the hailstorm of March 2012 as that was what he was hired to do. *See* Garza Deposition, Exhibit A, pg. 17, line 7 to pg. 18, line 7; pg. 19, lines 1 to 25; pg. 63, line 15 to pg. 64, line 3; pg. 89, line 15 to pg. 90, line 13.

Nor has Mr. Garza relied on any methodology, accuracy or reasoning employed by actual experts in the field of determining causation of property damage. Mr. Garza admittedly did not review and has not relied on any studies, articles, data collections or conclusions of any such experts. *See id.* at pg. 19, lines 1 to 25.

Mr. Garza's testimony is also not reliable at every step as his "methodology" is not reliable nor are the facts underlying Mr. Garza's opinion reliable, especially considering the facts that Mr. Garza overlooked (e.g. prior storms, installation). *See Macy*, 2015 U.S. App. LEXIS 9338, at *10-11. Nor has Mr. Garza employed the necessary intellectual rigor for his testimony (especially considering the many facts that he admittedly did not consider). *See Kozak*, 512 F. Supp. 2d at 917; *Kumho Tire*, 119 S. Ct. at 1176.

Since Mr. Garza's methodology is not reliable, Church Mutual's Motion to Exclude Expert Opinions on Causation should be granted.

### C.     The foundation for Mr. Garza's methodology is not reliable and it does not pass the reliability gates.

Mr. Garza admitted he only performed a "quick cursory inspection" which is the basis of

14

his conclusions:

> Q. All right. When is the second time you get up?
>
> A. Well, the first time we came it was probably around two weeks prior. And then we -- the following week we came back because we had to come and check on the crews working, and came back to the church. The first trip we were here it was raining. We couldn't get up on the roof. The second trip is when we got up there, did a quick inspection. We determined that -- we found hail damage and reported back to John.

*See* Garza Deposition, Exhibit A, pg. 43, lines 14 to 19, pg. 44, lines 7 to 16 (pg. 43, lines 14 to 19 shows the context of the quoted testimony). When Mr. Garza purportedly "found hail damage," he had only done a "quick cursory inspection." *See id.* at pg. 43, lines 14 to 19, pg. 44, lines 13 to 16.

Mr. Garza also admitted he had never been on the subject roof prior to his quick cursory inspection in December 2014:

> Q. … Okay. So you get a phone call sometime about the middle of December 2014. You'd never been on the roof of the temple prior to that time, had you?
>
> A. No, sir.

*See id.* at pg. 35, lines 18 to 21. Mr. Garza therefore had no knowledge of what dings or dents already existed prior to the hailstorm in March 2012. Mr. Garza also therefore had no knowledge of what granule accumulation had already occurred prior to the hailstorm.

Mr. Garza explained his method of determining causation involved a single quick inspection and he merely looked for physical damage like dents, dings and deficiencies caused by wind or hail, uplifted panels, ripped off metal facia, anything else that was loose and granule accumulation. *See id.* at pg. 64, lines 6 to 25; pg. 71, line 19 to pg.72, line 25. Mr. Garza

15

admittedly failed to take into account the condition of the roof prior to the hailstorm at issue. *See id.*

Since the foundation for Mr. Garza's opinions is not reliable, Church Mutual's Motion to Exclude Expert Opinions on Causation should be granted.

## CONCLUSION

For these reasons, Defendant Church Mutual Insurance Company respectfully requests the Court grant its Motion to Exclude Expert Opinions on Causation and enter an Order prohibiting Guadalupe Garza from testifying as an expert witness on causation or otherwise giving any opinions relating to the causation of the property damage at issue. Defendant further requests the Court award Defendant such other and additional relief to which it may be justly entitled.

        Respectfully submitted,

        SHEINESS, GLOVER, & GROSSMAN, L.L.P.

By: _____
        Marc A. Sheiness
        Attorney-in-Charge
        Texas State Bar No. 18187500
        Federal Bar No. 2591
        4544 Post Oak Place, Suite 270
        Houston, Texas 77027
        (713) 374-7005 Telephone
        (713) 374-7049 Facsimile
        Email: msheiness@hou-law.com

        Attorney for Defendant
        CHURCH MUTUAL INSURANCE COMPANY

## CERTIFICATE OF CONFERENCE

I HEREBY CERTIFY that my office conferred with opposing counsel about the relief requested in this Motion to Exclude Expert Opinions on Causation by correspondence sent on July 15, 2015 and opposing counsel replied and stated he is opposed.

_____
Marc A. Sheiness

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing instrument has been served on all counsel of record by the CM/ECF system of the Southern District of Texas, in accordance with the Federal Rules of Civil Procedure and applicable Local Rules on this 17th day of July 2015.

John A. Millin IV
MILLIN & MILIN, L.P.
4900 N. 10th Street, Suite C4
McAllen, Texas 78504

_____
Marc A. Sheiness